IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02352-MEH

ERICA JEAN HINES,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Erica Jean Hines appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c.   Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.   After consideration of the parties' briefs and the administrative record, the Court reverses the ALJ's decision and remands the Commissioner's final order.

# BACKGROUND

## I.   Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for DIB and SSI benefits filed in the State of Washington on March 24, 2006.  [AR 63-67; 384-388] After the applications were initially denied on June 23, 2006 [AR 56-59] and denied on reconsideration on September 25, 2006 [AR 52-53], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for October 2, 2007 in Seattle, Washington. [AR 409-413]  Thereafter, the ALJ issued a written ruling on February 19, 2008 finding at Step 4 that Plaintiff was not disabled since December 31, 2005 because she could perform her previous job as a hostess.  [AR 396-408] Plaintiff requested review of the decision [AR 451], and on August 24, 2010, the SSA Appeals Council vacated and remanded the ALJ's decision. [AR 455-459]

On January 26, 2011, Plaintiff, now living in Colorado and through new counsel, requested a hearing on her case. [AR 464-468] An ALJ scheduled a hearing upon the Plaintiff's request for August 23, 2011 in Denver, Colorado. [AR 478-483] The Plaintiff, a medical expert, and a vocational expert testified at the hearing. [AR 890-976] The ALJ determined to continue the hearing to obtain updated mental health records; a subsequent hearing occurred on March 5, 2012 and the same persons testified. [AR 866-889] The ALJ issued a written ruling on March 30, 2012 finding the Plaintiff was not disabled since December 31, 2005 because she could perform her previous jobs as a bead inspector and stock clerk. [AR 17-40] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR 8-11].  *See* 20 C.F.R. §

2

416.1481. Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on January 14, 1983; she was 23 years old when she filed her applications for DIB and SSI benefits on March 24, 2006.  [AR 63-67; 384-388]  Plaintiff claims she became disabled on December 31, 2005 [AR 384] and reported that she was limited in her ability to work by "depression and posttraumatic stress disorder."  [AR 349, 358]

Plaintiff presented to a consultative examiner, Lisa Cosgrove, D.O., on April 27, 2006. Plaintiff reported to Dr. Cosgrove that she was fired from her job on December 29, 2005 for alleged theft, and from her previous job as a restaurant hostess for "sexual harassment." [AR 349] She also reported she was sexually assaulted by her stepfather between the ages of 2-6; she was married in 2002 and had a 3-year-old son, who was removed from her custody for "failure to thrive" when she was abusing alcohol; she attempted suicide in 2004 for which she was not psychiatrically hospitalized; and her daily activities included sleeping from 3:00-4:00 a.m. until 2:00-5:00 p.m., showering and dressing, then going to a "gaming" store where she played games with friends until 8:00 p.m. - 12:00 a.m. [AR 349-353] Dr. Cosgrove diagnosed Plaintiff with mood disorder, nos and personality disorder, nos, and assessed Plaintiff with a GAF score of 60.[1] [AR 354]

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":

On May 26, 2006, a reviewing examiner, Thomas Clifford, Ph.D, reviewed Plaintiff's records and found she was moderately limited in the abilities to understand, remember, and carry out detailed instructions; sustain an ordinary routine without special supervision; complete a normal

---

• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers without distracting them or exhibiting behavioral extremes; Dr. Clifford also found Plaintiff markedly limited in the ability to interact appropriately with the general public. [AR 355-357]

Plaintiff presented for an Initial Psychiatric Evaluation on June 2, 2006 with "KITSAP Mental Health Services" ("KITSAP") concerning her "depression and PTSD." [AR 549] Plaintiff reported a history of mental health counseling and stated she had been on Prozac until August 2004; she was told her biological mother abused alcohol during her pregnancy with Plaintiff; Plaintiff lived with her mother and stepfather (who abused her) until age 6, then lived with her father and stepmother until she was 18; Plaintiff historically engaged in self-destructive and impulsive behaviors, including sexual promiscuity; and, she overdosed on Prozac in August 2004, likely "sparked by her being on prednisone." [AR 549-551] The nurse practitioner diagnosed Plaintiff with Posttraumatic Stress Disorder, Sexual Disorder, NOS, and Major Depressive Disorder, recurrent, moderate. [AR 551]

Plaintiff participated in individual counseling with KITSAP from June 5, 2006 through November 3, 2006 during which time the therapist discovered information leading to Plaintiff's arrest and incarceration on November 28, 2006. [AR 594-599] The record indicates that Plaintiff was to be released from incarceration on April 27, 2007. [AR 572]

On May 10, 2007, Daniel Nelms, Psy.D., completed a Psychological/Psychiatric Evaluation of the Plaintiff for the Washington Department of Social and Health Services (DSHS). [AR 608-613] The report is mostly illegible, but it appears that Dr. Nelms diagnosed Plaintiff with borderline

personality disorder, subsyndrome posttraumatic stress symptoms, depressive disorder, nos, and level 1 sex offender. [*Id.*] He also found Plaintiff mildly to moderately limited in most cognitive factors and moderately to markedly limited in most social factors. [*Id.*]

Plaintiff started individual counseling again with KITSAP Mental Health Services on June 8, 2007 and met sporadically with a therapist until September 11, 2008, with a long gap between February 7, 2008 and June 13, 2008. [AR 55-567; 652-659]  On July 10, 2008, Plaintiff reported that she was "doing good" and her depression level was "zero." [AR 657] She called a new therapist on February 26, 2009 denying any specific needs and agreeing to "meds only" service. [AR 661] Plaintiff started treatment again on April 21, 2009 at the request of her parents who had been caring for her 6-year-old son for 5-1/2 years. [AR 666] She met sporadically with a therapist until November 2, 2010; the clinic discovered in December 2010 that Plaintiff had moved to Colorado. [AR 667-679] During this time period, she was diagnosed with major depressive disorder, recurrent, moderate; paraphilia, nos; posttraumatic stress disorder; learning disorder, nos; and personality disorder, nos. [AR 688-697]

Meanwhile, on October 15, 2007, Norma L. Brown, Ph.D., completed another Psychological/Psychiatric Evaluation of the Plaintiff for the Washington Department of Social and Health Services (DSHS). [AR 626-643]  The report is somewhat illegible, but it appears that Dr. Brown diagnosed Plaintiff with borderline personality disorder, bipolar I disorder, MRE depressed, PTSD, partial remission, and alcohol abuse, in remission. [*Id.*] She also found Plaintiff mildly limited in most cognitive factors and moderately to markedly limited in most social factors. [*Id.*]

On February 10, 2011, Plaintiff presented to the Arvada Clinic in Colorado for "prescription

6

refills." [AR 778-781] Plaintiff reported that she had been diagnosed with "bipolar disorder and PTSD" and was experiencing severe depression over the past three weeks. [*Id.*] James Cardasis, D.O. diagnosed Plaintiff with bipolar disorder and prescribed Wellbutrin, Lyrica, and Abilify. [AR 780]

Plaintiff next presented to Gil Milburn-Westfall, Psy.D. for a consultative mental health examination on April 6, 2011. [AR 644-651] Plaintiff reported to Dr. Milburn-Westfall the sexual abuse she experienced as a young child; that her marriage ended in 2008; she had an 8-year-old son who lived with her parents in Washington; she moved to Colorado in November 2010 to be with her boyfriend whom she saw every other day; she slept "20 hours per day" due to her depression, she enjoyed watching television and movies and playing "role games" on the computer; she had two arrests in 2007 and was registered as a sex offender; and she had "not had any medications of any kind since October of 2010." Dr. Milburn-Westfall reviewed Plaintiff's medical records, performed a mental status examination and diagnosed Plaintiff with mood disorder, nos (mild to moderate) and personality disorder, nos, and assessed a GAF score of 65. [AR 647] Dr. Milburn-Westfall concluded that Plaintiff "appears to be invested in being seen as disabled ... she appears to exaggerate the intensity of her problems." [*Id.*]

Plaintiff presented on September 30, 2011 to Richard Carson, M.D. for a consultative physical examination. [AR 789-797] Plaintiff reported her "major complaint" as depression, but also stated that she suffered from "fibromyalgia[,] interstitial cystitis," and "chronic suprapubic discomfort"; she had "manic phases" that could last 24 hours; she could sit and walk for about 30 minutes and stand for about 15 minutes; she could lift and carry 10 pounds and could push, pull,

reach, bend, crouch and climb stairs; she socialized with friends and went grocery shopping; and, she was on no prescription medications because she could not afford them. [AR 789-790] After a thorough examination, Dr. Carson concluded that suffered from chronic pain, a history of interstitial cystitis, and obesity, and stated, "I do not believe she has any significant limitations to usual physical activity." [AR 791] On October 24, 2011, Dr. Carson prepared an addendum to his report saying he believed he "underestimated her abilities" and "she does have some physical restrictions related to her gender, height and weight as well as her interstitial cystitis with frequency of urination." [AR 798]

On October 25, 2011, Plaintiff presented to Denver Health as a new patient and reported "major depression," but the record is mostly illegible as to any further relevant information. [AR 822] Likewise, Denver Health records from December 16, 2011 and January 12, 2012 are mostly illegible. [AR 816-817]

## III.     Hearing Testimony

At the hearing on August 23, 2011, the Plaintiff, her counsel, psychological expert, Thomas Atkin, and vocational expert Martin Rauer appeared.  [AR 890-78] The ALJ opened by explaining she was not bound by the February 2008 decision and "this will be a new and independent decision on your case."  [AR 893]  The ALJ next called Dr. Atkin and he testified that under 12.04 (affective disorders) Plaintiff had been diagnosed with a major depressive disorder, under 12.06 (anxiety-related disorders) Plaintiff was diagnosed with posttraumatic stress disorder, and under 12.08 Plaintiff had "cluster B characteristics not otherwise specified," which he described as moderate limitations in activities of daily living, and difficulties with maintaining social functioning,

8

concentration, persistence and pace. [AR 896-897] He also asserted that Plaintiff would meet the

12.04 severity listing under section C.2.[2] [AR 897-898] He concluded, "with continued treatment

[Plaintiff] would be able to engage in [substantial gainful activity] in the future." [AR 898]

The Plaintiff then testified that her last paid work was December 2005 and since that time,

she had cared for two small children while paying $300 in rent to the parents for room and board.

[AR 899-901] She also testified that she typically experienced manic episodes followed by deep

depression, where she would sleep 12-17 hours per day, for three-week period every three months.

[AR 905]

The vocational expert, Mr. Rauer, testified that an individual with Plaintiff's age, experience

and education – who should have rare to no interaction with the general public, no interactions with

---

[2]Appendix 1 to Subpart B of Part 404 sets forth the "Listings of Impairments":

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
. . .

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
. . .

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

children, and only occasional interactions with coworkers and supervisors – could perform Plaintiff's past job of bead inspector, as well as the jobs of small product assembler, electronics worker, and floor wax technician. [AR 902-904] He also testified that an individual in the same hypothetical who missed work for a three-week period every three months and/or who missed 3-4 days per week would be unemployable.  [AR 906-907]

Because the Plaintiff underwent a consultative examination subsequent to the August 2011 hearing, the ALJ gave the Plaintiff an opportunity to appear for another hearing before the ALJ. That hearing occurred on March 5, 2012, at which the Plaintiff, her attorney, Dr. Atkins, and Mr. Rauer appeared. [AR 866] The Plaintiff testified she was fired from the "nanny" position in 2009; she disagreed with Dr. Carson's assessment of her physical abilities because she was allergic to mold, she had lower back pain, and she had to go to the bathroom every 30-60 minutes due to her "bladder condition"; she had experienced mood swings in the past three months in which she "got belligerent" and "physical"; and she typically slept between 16-20 hours per day depending on the time of the month, even having taken her medication.  [AR 871-878]

The ALJ then called Dr. Atkins who confirmed that no new information changed his opinion that Plaintiff met the 12.04(C) severity listing; he also testified that the impairments of sexual disorder and bipolar disorder fall under the categories of personality disorders and depression, respectively. [AR 879-882] He concluded that "if she continues with sobriety and treatment compliance, I would expect her to be able to rejoin the work force in the near future." [AR 882]

Mr. Rauer testified that an individual with Plaintiff's age, experience and education – who should have rare to no interaction with the general public, no interactions with children, only

occasional interactions with coworkers and supervisors; is limited to light work activities, frequently balancing and working foot controls, occasionally climbing, stooping, kneeling, crouching, crawling; have occasional exposure to hazards, humidity, dust, fumes, odors and other pulmonary irritants but no exposure to mold; and only occasional exposure to extremes of hot or cold and vibrations – could perform Plaintiff's past jobs of bead inspector and stock clerk, as well as the jobs of small product assembler and electronics worker. [AR 884-886] However, a person in the same hypothetical who needed to take bathroom breaks every 30 minutes for 5-6 days per month and/or who was absent one day per week would not be able to engage in competitive employment. [AR 886-888]

The ALJ issued an unfavorable decision on March 30, 2012.  [AR 20-40]

## LEGAL STANDARDS

## I.      SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two

is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom.

If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ opened by describing the lengthy procedural history of this case and the requirements imposed by the Appeals Council on remand of the case to her. [AR 20] Next, she ruled that Plaintiff had not engaged in substantial gainful activity since the onset date of her disability, December 31, 2005 (Step One). [AR 24] Further, the ALJ determined that Plaintiff had the following severe impairments: major depression, posttraumatic stress disorder (PTSD), personality disorder, alcohol abuse in remission, chronic pain, obesity, degenerative disc disease of the lumbar spine, history of interstitial cystitis, and fibromyalgia/chronic fatigue syndrome (Step Two). [AR 24-25] The ALJ also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 25-26]

The ALJ then determined that Plaintiff had the RFC to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional restrictions: can frequently balance; can occasionally climb, stoop, kneel, crouch and crawl; can tolerate occasional exposure to extreme cold, extreme heat, humidity, wetness, vibrations, dust, odors, fumes, poor ventilation, pulmonary irritants, and hazards such as unprotected heights, moving mechanical parts, and operating a motor vehicle; should never have exposure to mold; can frequently operate foot controls with the bilateral lower extremities; is able to have work interactions occasionally with supervisors and coworkers; should have work interactions with the general public rarely to never; and cannot work around children." [AR 26]   The ALJ found that the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [AR 27]

The ALJ went on to determine that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff was capable of performing her past relevant work as a bead inspector and stock clerk (Step Four). [AR 38]   As a result, the ALJ concluded that Plaintiff was not disabled at Step Four of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 38-40]

Plaintiff sought review of the ALJ's decision by the Appeals Council on March 30, 2012. [AR 8]   On June 27, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of

the Commissioner of Social Security." [AR 8-10] Plaintiff timely filed her Complaint in this matter

on August 25, 2014.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ failed to weigh the medical

opinion evidence properly; (2) the ALJ failed to consider all of the Plaintiff's impairments in

combination when evaluating her residual functional capacity; (3) the ALJ's finding that Plaintiff

can return to her past relevant work is not supported by substantial evidence; and (4) the ALJ's

finding that Plaintiff can perform alternate work is not supported by substantial evidence.

## ANALYSIS

The Court will address each of Plaintiff's issues in turn.

## I.      Whether the ALJ Erred by Failing to Weigh Medical Opinions Properly

Although the Plaintiff characterizes her first challenge as a "failure to weigh medical

opinions," the Court finds Plaintiff's challenge is actually to the ALJ's rejection of Dr. Atkin's

opinion at Step 3 of the evaluation.  Dr. Atkin was retained by the SSA to review Plaintiff's medical

record and testify at the hearings.  Dr. Atkin testified on August 23, 2011 that, although Plaintiff did

not meet the "paragraph B" criteria for severity of impairments, he believed Plaintiff met the

severity requirements listed in paragraph C, subparagraph 2, of Listing 12.04 [AR 897-898], and he

testified again on March 5, 2012 that the new evidence submitted did not alter his opinion [AR 879].

Dr. Atkin also testified that the medical record revealed Plaintiff was functioning at her best between

2009-2010, saying "it appears things are looking up for her and I would expect her to, if she

continues with sobriety and treatment compliance, I would expect her to be able to rejoin the

workforce in the near future. However, the problem, the primary problem has been being able to

maintain [employment, stability] over long periods of time and I'm not sure that she's fully stable

yet." [AR 881-882]

> Listing 12.04 provides, in pertinent part,
>
> Affective Disorders: Characterized by a disturbance of mood, accompanied by a full
> or partial manic or depressive syndrome. Mood refers to a prolonged emotion that
> colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity for these disorders is met when the requirements in
> both A and B are satisfied, or when the requirements in C are satisfied.
> . . .
>
> C. Medically documented history of a chronic affective disorder of at least 2 years'
> duration that has caused more than a minimal limitation of ability to do basic work
> activities, with symptoms or signs currently attenuated by medication or
> psychosocial support, and one of the following:
> . . .
>
> 2. A residual disease process that has resulted in such marginal adjustment that even
> a minimal increase in mental demands or change in the environment would be
> predicted to cause the individual to decompensate.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.04.

Regarding Dr. Atkin's opinions, the ALJ found at Step 3, "While the medical expert opined

that the claimant's impairments result in such marginal adjustment that even a minimal increase in

mental demands or change in the environment would be predicted to cause decompensation, thereby

satisfying the criteria of section 12.04C(2), the undersigned finds this opinion unpersuasive because

the medical evidence as a whole documents a significantly positive response to treatment and largely

normal mental status exams." [AR 25] In formulating Plaintiff's RFC, the ALJ further determined,

> The undersigned finds Dr. Atkins's [sic] opinions unpersuasive and accords them
> little weight because they are internally inconsistent, in that "moderate" limitations

> of the "B" criteria are not consistent with a risk for decompensation with even minimal demands or changes, and they are markedly inconsistent with the largely normal mental status exams, the reports of significant activities of daily living, and the persuasive opinion of the examining psychologist in exhibit 14F.

[AR 36]

For an ALJ to find that a severe impairment conclusively disables a claimant at Step 3, the impairment must be "equivalent to one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). "If the impairment is listed and thus conclusively presumed to be disabling, the claimant is entitled to benefits." *Id.* "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

The ALJ must make its Step 3 determination solely on medical evidence. See 20 C.F.R. § 404.1526(b). "[T]he step three analysis requires a comparison of medical evidence regarding symptoms, signs, and laboratory findings with the listed impairment sought to be established or the listed impairment most similar to the claimant's." *Larson v. Chater*, No. 95-2194, 1996 WL 709848, at *1 (10th Cir. Dec.10, 1996). Absent reference to a specific listing or a comparison of the evidence to that listing, the court is unable to meaningfully review the ALJ's decision. *Bolan v. Barnhart*, 212 F. Supp. 2d 1248, 1258 (D. Kan. 2002) (citing *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)). However,  "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not

meet or equal any listed impairment." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 1995).

The Plaintiff contends that the ALJ erred in rejecting Dr. Atkin's opinion because (1) his opinion is supported by substantial evidence, i.e. the opinions of six examining psychologists and a non-examining agency reviewer; (2) Plaintiff's daily activities are not a valid basis for disregarding Dr. Atkin's opinion; (3) Dr. Milburn-Westfall's opinion does not provide a substantial basis for rejecting Dr. Atkin's opinion; and (4) Dr. Atkin's opinion is not inconsistent with a positive response to treatment.

First, the Court finds unpersuasive Plaintiff's contention that the ALJ improperly considered Plaintiff's daily activities at Step 3; the plain language of the ALJ's decision demonstrates that she did not. Rather, the ALJ properly considered only medical evidence at Step 3 by concluding "the medical evidence as a whole documents a significantly positive response to treatment and largely normal mental status exams." [AR 25] The ALJ mentions nothing about the Plaintiff's activities of daily living during her Step 3 evaluation.

Accordingly, the Court proceeds to determine whether the ALJ's findings are supported by substantial evidence. Plaintiff challenges the ALJ's evaluation of the "medical evidence as a whole" by arguing Dr. Atkin's opinion is supported by those of seven mental health professionals, but the ALJ relies primarily on the opinion of one psychologist, Dr. Milburn-Westfall, whose opinion was inconsistent with all other medical evidence in the record and was predicated on a factual mistake. A review of the ALJ's evaluation of the medical evidence[3] reveals that she accorded only "little"

---

[3]*See Fischer-Ross*, 431 F.3d 729 at 733.

weight to the opinions from seven psychological assessments performed between 2004-2007 but concluded, "These treatment records demonstrate relatively good response to treatment and largely normal mental status exams." [AR 33] The Court finds the ALJ applied incorrect legal standards in coming to these conclusions.  First, it is not proper for the ALJ to substitute her opinion for that of a medical professional.  *See Hamlin v. Barnhart*, 365 F.3d 1208, 1221 (10th Cir. 2004) (an ALJ may not substitute his lay opinion on the effect of medical findings for that of a medical professional); *see also McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("[A]n ALJ may not make speculative inferences from medical reports and may reject a treating physicians opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*.") (emphasis in original).  Had the records each indicated the mental health professional's finding that the mental status exam was "normal," the ALJ's conclusion might be correct; but they do not.  In the same vein, had the health professionals noted in their reports that Plaintiff had "relatively good response(s) to treatment," the ALJ's conclusion might be correct; but, they did not.  By concluding that Plaintiff's mental status exams were "normal" and her response to treatment "positive," the ALJ improperly substituted her lay opinion on the effect of medical findings for those of the examiners.[4]

---

[4]The ALJ's decision does not reflect that she noted specific results of a mental health examination, such as "good eye contact, pleasant, and euthymic mood" and compared/contrasted them with a claimant's statements or other medical evidence submitted by the claimant in support of an argument that she cannot relate to others in a work setting.  Rather, the ALJ simply concluded from reviewing the records that Plaintiff's response to treatment was "relatively good," and Plaintiff's mental status examinations were "largely normal."  In so doing, and by rejecting Dr. Atkin's opinion for these reasons, the ALJ substituted her opinion for those of the doctor.

Second, even if the ALJ were permitted to come to such conclusions, her conclusions are not necessarily supported by the record.  The mental status examinations the ALJ describes as "largely normal" contain findings indicating they may not necessarily be considered "largely normal."  For example, on July 16, 2004, Dr. Pryor assessed Plaintiff's memory, fund of knowledge, abstract capabilities, and attention/concentration in his mental status examination, and found Plaintiff's recent memory was normal, her remote memory was intact except for events of early childhood, but her immediate memory was "slightly below normal"; Plaintiff's fund of knowledge was "marginally within normal limits"; her abstract thinking "evidenced significant deficits"; and for her attention/concentration, Plaintiff was able to perform serial 7's using her fingers, but was "incapable and refused" to perform reverse serial 7's. [AR 323-324] After further testing Plaintiff's cognition and personality, Dr. Pryor concluded Plaintiff "evidences multiple signs and symptoms that suggest significant psychological problems that will directly impair her ability to find and maintain employment" and noted Plaintiff's "impulsive, ill-considered, and short-term hedonistic approach she may take towards most life activities," indicating the possibility that Dr. Pryor did not assess Plaintiff's mental status as "largely normal." [*See* AR 326] Likewise, in March 2005, Dr. Brown noted the same or similar deficiencies in Plaintiff's memory and abstract thinking, and further noted deficiencies in insight, impulse control, and judgment/problem solving. [AR 332-334] Moreover, in March 2006, Dr. Compolongo noted Plaintiff appeared "sleepy" and "lethargic," had "poor" eye contact, had a "limited" fund of knowledge, no memory before age 7, "fair" comprehension, deficiencies in abstract thinking, and poor insight and impulse control. [AR 346-348] Further, in May 2007, Dr. Nelms also noted Plaintiff appeared "sleepy" and "lethargic," was cooperative but

was "rigid" and "tense," had deficiencies in her speech, errors in computing serial 7's, "impoverished" comprehension, deficiencies in thought process, an inappropriate and labile affect and dysphoric mood, and poor insight and impulse control.  [AR 614-616] Finally, in October 2007, Dr. Brown noted Plaintiff was "not showering regularly," had "fair" eye contact, had a "depressed [mood]/flat affect," errors in computing serial 7's, and deficiencies in judgment and "poor" insight. These findings do not appear to support a conclusion that Plaintiff's mental status examinations from 2004-2007 were "largely normal."

As for the ALJ's conclusion that Plaintiff had a "good response to treatment," the Court notes that Dr. Clem's opinion in May 2004 states Plaintiff "had only a limited response to psychotropic medications to date" [AR 301]; Plaintiff began counseling sessions in June 2006 [AR 603], but during counseling sessions between December 2006 - February 2007, Plaintiff was repeatedly reported as "not understanding," "unconcerned about," "disregarding" or "unaware of" the seriousness of her incarceration and the criminal charges lodged against her for child molestation [AR 576, 580, 582, 585, 587]; and Dr. Brown's opinion in October 2007 states Plaintiff "has been in therapy with minimal improvement" [AR 629].  The record also indicates that Plaintiff re-started individual counseling in July 2007 with a positive outlook and good motivation [AR 555-562], but attended only one session between December 2007 and June 2008, at which she described some trouble with following through on treatment "assignments" and maintaining her finances. [AR 653] Again, the Plaintiff "re-started" her individual therapy in July 2008 with a positive outlook and good motivation [AR 657], but in the following months, Plaintiff was reported as "looking disheveled," admonished for not following through with her treatment plan/assignments [AR 658-659], and

placed back on medication after voluntarily stopping it in July 2008 [AR 684]. The ALJ mentioned

none of these notations in her decision, and the Court finds the ALJ's conclusion that the "records

demonstrate[d] relatively good response to treatment" is not supported by substantial evidence. *See*

*Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (in arriving at a disability decision, the ALJ

"must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly

probative evidence [she] rejects.").

After proceeding to discuss the medical evidence between January 2009 and October 2011,

the ALJ again concludes, "These medical records document largely normal mental status exams,

good response to medications, and reports of relatively intact functioning." [AR 33-35] For the

same reasons as those set forth above, the Court finds these conclusions improperly substitute the

ALJ's lay opinions for those of the medical professionals. This error "is especially profound in a

case involving a mental disability." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).

With respect to Plaintiff's contention that the ALJ's reason for rejecting Dr. Atkin's opinion

– the evidence demonstrates a positive response to treatment – is improper because it is not

inconsistent with Dr. Atkin's opinion, the Court agrees. Unlike Paragraph B, Paragraph C of Listing

12.04 requires a "[m]edically documented history of a chronic affective disorder of at least 2 years'

duration that has caused more than a minimal limitation of ability to do basic work activities, *with*

*symptoms or signs currently attenuated by medication or psychosocial support*" (emphasis added).

In concluding Plaintiff met the criteria for Paragraph C, Dr. Atkin apparently took into account the

evidence demonstrating Plaintiff's positive responses to treatment; in fact, he testified that Plaintiff

"functioned the best" in the 2009-2010 time frame, and stated, "according to the medical records,

[ ] it appears that things are looking up for her and I would expect her to, if she continues with sobriety and treatment compliance, I would expect her to be able to rejoin the work force in the near future." [AR 881-882] "[I]f the ALJ rejects the [medical] opinion completely, [s]he must then give specific, legitimate reasons for doing so." *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003). Here, the ALJ's reason was not legitimate; accordingly, the Court finds the ALJ applied the incorrect legal standard when rejecting Dr. Atkin's opinion at Step 3.

Plaintiff also argues the ALJ's reliance on Dr. Milburn-Westfall's opinion in April 2011 is improper because the opinion contradicts the majority of other medical opinions in the record and is based on a factual mistake. The "mistake," Plaintiff contends, is Dr. Milburn-Westfall's statement that Plaintiff "has not taken any psychiatric medications for 6 months" [AR 646] and his conclusion that Plaintiff "is not taking any current medication for any psychiatric problems and she appears to exaggerate the intensity of her problems." [AR 647] It is unclear in her Step 3 evaluation whether the ALJ relies on Dr. Milburn-Westfall's opinion; however, to the extent she did, the Court agrees the doctor's opinion contains a mistake of fact. A February 2011 record indicates Plaintiff was "currently taking abilify 10 mg, cymbalta 30 mg/day, and lyrica 50 mg/day." [AR 779] At that appointment, Dr. Cardasis prescribed Wellbutrin for the Plaintiff to take in place of Cymbalta. [AR 780] Based on this information, Dr. Milburn-Westfall's belief that Plaintiff had taken no psychiatric medication since October 2010 is incorrect. [*See* AR 646] Then, in April 2011, the Plaintiff informed Dr. Cardasis that she "ha[d] not been able to afford her meds," so the doctor switched Plaintiff to Prozac. [AR 782-784] Dr. Milburn-Westfall does not indicate whether he understood Plaintiff to be unable to afford her medications. "Whether a person is being consistently treated with

available medication is important probative information." *Thomas v. Barnhart*, 147 F. App'x 755, 760 (10th Cir. 2005) ("As the Fifth Circuit has stated, 'the medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered. . . . To a poor person, a medicine that he cannot afford to buy does not exist.'" (citing *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) (footnotes omitted)).   Nevertheless, it is unclear whether the ALJ relied on Dr. Milburn-Westfall's opinion to reject Dr. Atkin's opinion at Step 3.   The ALJ's decision must "be sufficiently articulated so that it is capable of meaningful review." *Spicer v. Barnhart*, 64 F. App'x 173, 177-178 (10th Cir. 2003).

Finally, the Court agrees that Dr. Atkin's opinion is supported by the other examiners of record.  For example, in May 2004, Dr. Clem found the Plaintiff's "regular attendance in a full-time job may prove problematic for her and she would likely not be able to complete a full workday or workweek without significant interruptions from her depression and anxiety. *It is not anticipated that she would deal well with the usual stressors encountered in a competitive workplace environment*."  [AR 301 (emphasis added)] Similarly, Dr. Corpolongo noted in March 2006 that Plaintiff "gets emotional with stress." [AR 344] In April 2006, Dr. Cosgrove concluded that it would be likely the Plaintiff could sustain gainful employment "[p]rovided the claimant will see a psychiatrist for continued evaluation and medication management and ha[ve] access to that medical treatment ... she would have further stabilization of her symptoms which would improve her socialization skills, her ability to modulate her emotions, [and] her focus and concentration." [AR 354]

In sum, the Court finds the ALJ applied incorrect legal standards in, or insufficiently

articulated her reasons for, rejecting Dr. Atkin's opinion at Step 3, which, if followed, would conclusively establish Plaintiff's disability.

## II.   Remaining Issues

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal." *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 1348, n.1 (D. Colo. 2014). The Court expresses no opinion as to the Plaintiff's remaining arguments and neither party should take the Court's silence as implied approval or disapproval of the arguments. *See Watkins*, 350 F.3d at 1299 ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand."). The Court also does not suggest a result that should be reached on remand; rather, the Court encourages the parties and the ALJ on remand to consider fully and anew the evidence and all issues raised. *See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citation and quotation marks omitted).

## CONCLUSION

Based on the record herein, the Court concludes that the ALJ erred in her rejection of Dr. Atkin's opinion at Step 3 of the disability evaluation. Therefore, the decision of the ALJ that Plaintiff was not disabled is **reversed and remanded** to the Commissioner for further consideration in accordance with this order.

Dated at Denver, Colorado this 9th day of October, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge